All right, let's take up our 10 o'clock case, 11 Chiropractic Clinic v. Liberty Mutual Insurance Company. Argument for the appellate. Please proceed, Counsel. Thank you, Your Honor. I'm Dave Breskin. I'm an attorney in the NCI. I came here today... You're speaking up because we're recording. Oh, sure. Thank you. I came here today because my client, Dr. David Kerbs, believes strongly that auto insurers should not cheat doctors out of their fare and resources. This case, as you can tell from the pleadings, involves a nationwide settlement that will affect every provider and every insurer in the entire country. Let's be clear on what's going on, first of all. Liberty Mutual and Safeco are getting released from over $75 million in liability for reductions they made up to 12 years ago, using the Ingenex database to automatically reduce every provider's bill down to the 80th or 85th percentile of that database without any consideration whatsoever for whether the bill is reasonable. They are going to pay a fraction of that amount. The actual payout to the insurers and providers is reasonably calculated to be less than 2%. That's because a great number of the providers in a great number of states and insurers will get absolutely nothing. Nothing. That includes the providers in the state of Washington and the insurers in the state of Washington. This settlement also includes reductions made for the last three years using the Fair Health database up to the next five years into the future. The value of that settlement to Safeco and Liberty Mutual is over $250 million, reasonably estimated, based on the reductions they've made thus far and the fact that the Fair Health database is not significantly different than the Ingenex. They will pay absolutely nothing, zero, to anybody, any provider or any insurer for that release. Nothing. The Survey Court did not analyze whether the agreement was fair, adequate, and reasonable in any way, in a single paragraph. There is a conclusory statement it is, without any analysis whatsoever. Dr. Curbs objected to the settlement. Dr. Curbs, to give you a little background, is a sole practitioner. He comes from a small city in the state of Washington. As I said, he believes very strongly that the law needs to be followed. In the state of Washington, the personal injury protection coverage taught by the insurer at an extra premium requires that insurers like Liberty and Safeco pay all reasonable medical bills. That is not true in Illinois. Illinois has a different structure. Illinois is an at-fault state. The at-fault driver pays. In Washington, the insurer has an absolute right, by statute, to have its insurer pay all reasonable bills. The insurance policy in Illinois is also different. In Illinois, the insurer is required to pay a usual or customary fee. Not all reasonable. All reasonable is the standard in Washington. Unlike Lebanon, which settled its case less than 120 days after it was filed, with no discovery whatsoever of any nature, with no motions practiced whatsoever of any nature, and settled for being paid a fee of $3,000, roughly 10 times the amount of its reductions, plus 50% of the reductions of the internet, and its attorneys got $1.2 million. No discovery. No motions. No depositions. In contrast, Dr. Kurtz sued Safeco in Washington. He litigated for two and a half years. He litigated in the state court, trial court, appellate court, the federal district court, and the ninth circuit, because that's where Safeco took him. Before he was able to prevail through his settlement. He sat for two depositions. He submitted thousands of pages of documents. He even allowed Safeco to go to his little office and take documents off his computer. Dr. Kurtz believes strongly that Washington providers needed to be protected in this case from the release. That provided Washington insured and Washington providers nothing. And the reason is simple. The practice of Safeco and Liberty Mutual leaves the insured holding the bag. It leaves the provider in the position of either going after their patient for the difference or writing it off. Both of those are not good results for the provider. And providers like Dr. Kurtz in particular, solo practitioners, don't go after their patient. They can't afford it. And they won't. And that is something known to the insurance company. Dr. Kurtz put his energy and his time and his effort and his money where his mouth was. He went after Progressive as well because Progressive is also one of the few insurers who do this. Use a computer to automatically reduce every bill and not pay reasonable bills. Dr. Kurtz, again, sat for two depositions in that case. He responded to discovery. And then he sat through a five-week trial. You have to think about this in practice. This is a solo practitioner. He sat through five weeks during the most productive time of the day for him to treat patients. To get a result that protected him and other Washington providers. And he won. Indeed, it took this jury of 12 people less than 55 minutes after a five-week trial to find that Progressive practice, which is identical in every respect to what Liberty and Safeco do, was illegal in Washington, an unfair practice, and that it harmed consumers and providers alike. It was a unanimous verdict in less than 55 minutes. The insurance company put on its case for three weeks. We brought this to the attention of the circuit court. Dr. Kurtz objected that the settlement was not fair, adequate, or reasonable. It was not particularly fair, adequate, and reasonable for Washington providers. How could it be? They got absolutely nothing. There was a conflict Lebanon had. Lebanon got 50% of its reductions plus a $3,000 fee, and its attorneys got $1.2 million. Dr. Kurtz and other Washington providers got nothing. Nothing. We brought to the attention of the circuit court that it lacked jurisdiction, subject matter jurisdiction under this state's Supreme Court decision in Avery, that you cannot certify a nationwide class or approve it unless the acts giving rise to the claims arise in Illinois. There are absolutely no acts whatsoever involving Washington providers or non-resident Illinois providers that occurred in the state of Illinois. Nothing. The two insurance companies are Massachusetts companies. In Avery, the Illinois Supreme Court also made clear that you can't bring a nationwide contract claim unless you show the insurance contract is identical in language in every state. That makes perfect sense. Here, as I've mentioned, the state of Washington requires all reasonable bills to be paid. It's a no-fault state. Illinois is an at-fault state. The policy requires a payment of a usual and customary fee. There are two different states. The circuit court, when you read the transcript which has been submitted, did not consider Dr. Kurtz's objections at all. Nothing is mentioned about Dr. Kurtz. Nothing. In the transcript, the circuit court makes no factual findings of any nature whatsoever under Avery. It makes no findings that there are acts involving Washington providers or non-resident providers that occurred in the state of Illinois. It makes absolutely no findings, because it wasn't even presented with the insurance policies of the other states, that they were similar to. There is no factual record under Avery by which the circuit court could have certified this. Absolutely none. The courts of Illinois, like the federal Seventh Circuit, have made very clear that when, as here, a settlement is reached on a nationwide basis, a class settlement, before certification, before any discovery or motions practice, it is given heightened scrutiny. You are supposed to go through with heightened scrutiny the basis. The Illinois courts follow the Korshak, it's K-O-R-S-H-A-K, decision and factors when evaluating whether a settlement is fair, adequate, and reasonable. The most important consideration is what is the likelihood of success on the merits. As I've explained, two years before this settlement, Dr. Kurtz had proven in the state of Washington the identical practice was illegal, an unfair consumer practice, and harmed consumers and insurers. He did so in a five-week trial that resulted in a jury verdict of less than 55 years. The circuit court makes no finding whatsoever, none, about why the settlement is fair, adequate, and reasonable. There is a single paragraph in which he says, in a conclusory manner, the notice is adequate, I think the settlement is fair, adequate, and reasonable. No consideration of why it would be for those providers like Washington Privates to get absolutely nothing. Despite the fact that in Washington, as I've said, in the progressive place, it was established the practice is illegal. No consideration at all given by the trial. Now, as I said, Dr. Kurtz is here because he feels strongly that the release is an overreach, that this agreement is not fair, adequate, and reasonable. His primary concern and the primary objective in the appeal, as you can tell from his appeal brief, is that he wanted to protect Washington providers. He asked the circuit court to carve Washington providers out and refused to do so. He had to appeal to this court. But in the interim, another Washington provider sued, Dr. Chan from Chan Healthcare. He has no connection whatsoever to Dr. Kurtz. I am Chan's attorney, but other than that, there's no connection. I have lots of different healthcare provider clients. Chan sued Safeco and Liberty Mutual. One of the issues was whether or not this settlement, the Lebanon settlement, should be applied to Washington providers consistent with federal due process. That is not an issue. That is an issue that presupposes the Lebanon agreement is valid and reasonable. That was presented to the state court in Washington. And in the transcript we have submitted to the court in order, this court, it shows that on October 30, the Washington state court, Judge Schaefer, ruled that the Lebanon agreement's release cannot be applied to Washington providers consistent with federal due process. It cannot because, for one thing, she ruled that Lebanon had a conflict of interest in its representation. That the claim arising under Washington law does not share the identical factual predicate for a variety of reasons, many that I've just explained, which is that the laws are different and the policies are different. She ruled that Lebanon had undervalued Washington providers' claims when it got absolutely nothing for them, at the same time evaluating its claim of 50% of the reductions for Ingenex and getting a $3,000 fee. She ruled that under Avery, the circuit court could not certify a nationwide class. There was no class related to Washington providers' claims that arose in Illinois. And there was no showing that the Illinois policy was identical to Washington policy. That ruling grants Dr. Kirby essentially the primary relief he sought in this case and in this appeal. And the timing is such that he had to do the appeal first to protect Washington providers, but now that relief provides the relief against Safeco. A similar ruling would have been made in the case against Liberty, but Liberty chose to forearm shot. It asked the federal court to decide the issue by, after stipulating to having Judge Schaefer decide it on October 3rd, it removed the case of Champ v. Liberty to the federal court, two days, less than 48 hours, actually, before the hearing. So that matter now is in the federal court, but will be remanded shortly back to Judge Schaefer without question. And then Judge Schaefer's order will become racially counter-platter, stoppable against Liberty in the interim. But it is curious that at the same time they were blasting Dr. Kirby before you in this case, they asked that the federal court decide the issue. They removed the case to the federal court. Now, we filed a motion for remand, and that motion was set for hearing on December 4th, so it's been fully briefed, and the federal court will decide it, I believe, probably by the end of January. Maybe a little longer, given the judge's schedule. It would make sense, I think, Your Honors, to wait and see what the federal court does, because if it does remand the case, then I believe Judge Schaefer's order will clearly be platter-stoppable, racially counter-platter against Liberty Mutual. Keep in mind that Liberty Mutual is the parent. It owns Safeco. It owns all of the companies that are involved in the settlement. One other thing I should mention, Your Honor, that in the Chan case, Judge Schaefer ruled that Chan and Washington Privates could sue Safeco for the individual reduction paid to their bill, failing to pay a reasonable bill. She also ordered that Chan amend the complaint, and that amendment is going to be filed, I believe, in February, perhaps March, under the parties' agreement. But in any event, the Safeco situation is somewhat different in Washington than Liberty, because there is no prior settlement involving Liberty Mutual in Washington. That's where this is going to come into effect, and that's why Judge Schaefer's order is important. Finally, I just want to make a personal note. I, a small-time, with a small firm, attorney in Seattle, I came here because what happened in this case is wrong. I do small class actions, usually focusing on the state of Washington, but I'm proud of being a class action attorney, because a class action tool is a device that levels the playing field, that allows consumers and insurers and providers an opportunity, when they have very small claims, to rectify a wrong committed by large companies like these insurers. What happened here offends the public confidence and integrity in that system. When you settle a case after 110 days and provide a sweetheart deal where the insurer is getting out of over $300 million of liability, not even including, we're not even talking about the interest going back 12 years, because this deal goes back 12 years, and you end up getting $1.2 million in fees and your client gets 10 times the amount of reductions, that's wrong. That is just wrong. It erodes confidence in our system, and it personally offends me. That's why I got out of the plane, flew here, drove here, to be here today. As I said, Dr. Kurz believes strongly that this release is harmful to Washington providers and their insurers. So what's left after Judge Schaefer's release for this court? What's left, I believe, is the question about whether the court should affirm the circuit court's decision to approve a nationwide settlement. I think this settlement is not fair, adequate, and reasonable for non-Illinois providers for the reasons I've articulated. As I said, many of the providers in many states get absolutely nothing under this agreement. As I said, Liberty and Safeco are just of a handful of insurers who do this. The vast majority do not do this, including State Farm, the largest insurer in the state of Washington, and farmers. They don't automatically reduce provider bills. They pay all reasonable bills that come in. Without adequate findings, there is no way that this circuit court should have approved this settlement. And under Avery, it should not have certified a nationwide class. So what remains, I think, for this court is to vacate the order certifying the nationwide class and approving the settlement for non-Illinois providers. Thank you, counsel. You'll have the opportunity for rebuttal as well. Okay, thank you. Let's hear from the appellees. Ann, I see you're dividing your time, and I'm going to leave it up to you two gentlemen to keep track of your time. When one sets down, the other gets up. Okay. That may not be fair to them. Good morning, Your Honors. My name is Rob Schmieder. I'm an appointed class counsel. I represent the class representative appellees in this matter. Mr. Breskin walks into this court and essentially asks this court to do a couple things. Number one, asks this court, who he appealed to, to defer to a Washington state court to decide issues in this particular case. That's just simply inappropriate. This is a direct review of what the circuit court did in this particular case. The actions that he's taking out of the state of Washington, neither I nor the class have any opportunity to address half of these arguments that he's making out there. So what's before this court is what happened here, what happened in the trial court here. Now, the standard review here is an abuse of discretion. So when you look at accusing the circuit court of not doing any work whatsoever, not doing any review of this class action, you better get the law right, you better get the facts right, and you better make specific objections because everything you've heard today, most of it, was never made to the circuit court. I don't know where he comes up with his numbers of $250 million, $750 million. What this settlement provides is this settlement provides for the UCR reductions actually taken in the past, the difference between what was billed and what was paid, anyone, a claimant or a provider, gets 50% of that back. We calculated, based upon the data that we've collected from Liberty Mutual, that that's somewhere in the neighborhood of $3.6 million. So to say that it's 2%, I have no idea what he's talking about. It's 50% of the dispute, the matter of dispute, they get 50% of that back. No questions asked. They just have to fill out the claim form and provide the documentation, and away we go. Now, let's start off with what the law is. The law is that, he talks about Avery prohibits a nationwide class action. That's simply not true in any way, shape, or form. Avery did two things. Avery dealt with a verdict, an actual judgment in the case, and the Avery opinion is split in two. When it comes to the contractual side of Avery, what the court said, there was one jury verdict form, but there were multiple policies. And so we couldn't uphold the jury verdict on any of the policies because they just made this amalgamated jury verdict form on the instruction. And they then analyzed the different contractual language and concluded that, based upon that, they couldn't uphold the verdict. They said, had it been subclass, had it been addressed, maybe we could have done something differently. On the consumer fraud side, Avery applied the Illinois Consumer Fraud Act to the whole nation. Even though, maybe in some states, State Farm had operations and computer programs that operated solely in the other state and there were no activities or connections with Illinois. We don't have that situation here. A similar reading of the complaint points at page 15 of the record. The complaint specifically says it's brought under the Illinois Consumer Fraud Act for the substantially similar laws of the other states, which is exactly how we've done it in a bunch of other cases. This is not my first time in the room. We've been litigating these cases, these very same cases, for my firm has been litigating them since 2000. I've been personally litigating them since 2005 when I joined the firm. And so we know what we're doing. We know how to address these things. Now the other thing that he misrepresents to the court is that this settled after four months. I wish, I wish. We filed the first case in 2003 against American States. We filed another case in 2005 against Safeco. There was actually another case against Liberty Mutual in there as well. We took that position. We conducted quite a bit of discovery. We had experts. We went through everything. We had a new certification in Safeco that then was removed to the Seventh Circuit, remanded, came back to this court. This court addressed certification, told us we had to go through some other steps, and we came back down. During that same period of time, Lebanon Chiropractic, I discovered, who had served as a class representative in a bunch of other matters, had a bunch of discounts by Liberty Mutual. Liberty Mutual had purchased Safeco in the meantime. And so this case was, as we worked with experts, gathered all this stuff, and we had all the evidence and discovery from all the other cases, we then filed this lawsuit. It was at that point in time, because of all the other litigation that I've had with Mr. Yeager, who represents Liberty Mutual, that I contacted him and I told him, we just filed this lawsuit. How do we want to proceed? Can we stipulate to the discovery that we've already taken? There's going to be some updated information that I'm going to need. Maybe we can short-circuit this so we don't have to go through a big bunch of motion practice and discovery. We started working through that, and then we started discussing settlement again. We had discussed it in the past, and actually we had settled a case with him in the past years ago, the Froberg case. In the Froberg case, for UCR reductions, we obtained 25%. And when we went through this with the circuit court, and the circuit court, by the way, is a judge who's presided over other MedPay cases, MedPay cases that we've had. So he has experience with these. And in those cases, we've had a wide variety, based upon the circumstances, of anywhere from 20%, 25%, 60%. This one's at 50%. We've had some at 80% or 90%. Those were subject to some caps at issue, total amount that would be paid over time by the defendant. And so the question for the trial court was, considering all of that, did this fall within the range of reasonableness? That's the test. The test isn't, couldn't this be the absolute best result? I think it's a great result. I'm not ashamed of it at all. Is it a good result? Is it, does it fall within that range of reasonableness? The court considered all the Korshak factors. We briefed him, we talked about him at the hearing. He's, he's been through this process before. He asked us very specific questions. Mr. Breskin didn't show up at the, at the final fairness hearing. And I encouraged the court to actually take a look at his original objection. His original objection was focused on claiming that this settlement unraveled his curb settlement out in the state of Washington. He's tried to then run to Washington to get an injunction against the, the trial court. We went to the trial court and said, Judge, remember when we talked about this? We had the Frommer case. We had the curb settlement. And we wrapped the settlement all around those so we did not impact any of the rights or obligations of, the rights of the class or the obligations of liberty mutual in those cases. And we pointed right to the provisions of the settlement agreement. And the circuit court said, you're right. Yeah, absolutely. I remember you guys talking about this. Because we went through a whole history. Because I wanted to make sure that the court knew this wasn't settled after four months of filing a lawsuit. This involved years of litigation. Years of litigation which, by the way, again, are referenced in the complaint. It's right there. We allege the statute limitations are told from these prior actions. So, so, when you walk up to this court and you say that the trial court abused its discretion, you've got to get the law right. You've got to get those facts right. And, you know, there's some other things in here that I can tell that he just brushed off some briefs from objecting to other flex actions. He talks about a $15,000 incentive award in his reply brief. There was no $15,000 incentive award. It was $30,000 to recognize the amount of time that the class representatives spent on the case and for their willingness to step forward. So that was obviously taken out of it, out of something else. His argument about Avery has been rejected by a district court in Arizona that called the argument frivolous. So, and I'm not trying to make this a personal attack. What I'm trying to point to the court is, you've got to get the facts right. And the facts in this case are very simple. We have litigated this against Safeco and Liberty Mutual for more than 10 years. We collected an enormous amount of discovery. We've taken depositions, some of which were presented to this court in the prior appeal in the Bemis v. Safeco case. And so there's an exhaustive record that, that existed. And walking here saying no discovery was taken is just a flat out lie. So, the next issue is, can this, can Lebanon Chiropractic, and Leon DeMond, but Lebanon Chiropractic, who's the provider in this case, can it represent Dr. Curbs and any other Washington providers? And the answer is absolutely yes. Because the question is one of adequacy of representation. And they're not, he's not challenging, he's never once challenged class counsel's experience or knowledge or skill. It's simply that, well, there's a different cause of action in Illinois than there is in Washington. There's a couple of points to be made. The question of adequacy is whether the same factual predicate exists. So, in other words, when courts have looked at this, they said, what are you really arguing about? Do you have the same basic claim? And the question here is, did Liberty Mutual or Safeco or one of its other subsidiary companies reduce your bills based upon a usual customary reasonable, a UCR discount? The answer is yes. Did it do the same thing with Dr. Curbs and maybe other Washington providers? Yes, that's all this case is about. It's the exact same factual predicate. He can argue that Washington's no fault, Illinois's at fault. That misses the whole point. This isn't third-party coverage. This is first-party coverage. We all know that MedPay coverage is for when, if I'm in an accident, even if it's my fault or someone else's fault, my MedPay coverage covers my bills. So the question isn't even whether there's fault or no fault. That's irrelevant. The question is, did this provision get triggered, number one? And was there a discount taken, number two? And if you meet those two facts, you're in the class. And there's no difference whether you're in Illinois, Washington, any other state. Now, to also say that we didn't analyze the policies ignores thousands of pages of the record where we actually filed the sample forms for the circuit court in this case. So we put all of that before the circuit court. But this is a settlement. So the question isn't about a certification class. It's a settlement class. And so courts have said that certain issues about manageability from the Supreme Court of the United States in Amhen, if there's manageability issues, get washed away in the settlement because that's the whole point of the settlement. The settlement addresses those issues. But getting back to adequate representation, there must be an intra-class conflict. Meaning, let me have a factor that has an interest that would somehow depreciate the interest of the Washington providers. And that conflict must be fundamental. There's never been an argument for any proof or anything that that exists. It just simply doesn't exist in this situation. We also point out, I'd like to address, he didn't address this in his oral argument, but one of the arguments I've never been able to understand. And he keeps talking about, you know, we're waiving all these claims in the future. We found part of this case was a declaration, a declaratory judgment. It was a dispute about policy language. What does reasonable mean? I mean, we cite in our briefing, in all the policy forms, they define it as certain things. And we want to, we have a dispute about that and we want clarity about that. So part of the settlement addresses that count. Going forward, for paying the future claims, we're agreeing that they have to use the Fair Health database. The database that resulted from the New York Attorney General's investigation into the Ingenix database. That was supposed to address all the problems with the Ingenix database. They have to use that one and they have to use it at no less than the 80th percentile. Now, just so the court is clear, we put this in front of the circuit court, that other insurance companies have gone and used Medicaid, Medicare, all of that. Am I running over my time? Just a couple of seconds. Okay. So unless the court has any questions specifically from class counsel, I'll hand it over to Liberty Mutual. Thank you. Good morning, Your Honor. Russell Rieger from Liberty Mutual. I'm a defendant of penalties. In just a couple of brief moments, I'd like to say a couple of things. Number one, I think it is incredibly important for the court to actually look at the objection that was filed in the trial court. And to look at the responses that were filed, the written responses filed to that in the trial court. They appear at C-330 is where the objection is. C-952 is the class rep's response. 337-65, I think, is the defendant's response. If you see what he actually argued and what he argued today, I think you'll see it's a dramatic difference. The second point I'd like to make is these are complex cases. Class actions are complex cases. There have been several prior cases. Mr. Breskin said there is no prior case involving Liberty Mutual. That's false. There was a Liberty Mutual case that Mr. Shmita referenced, a Frober case that was certified in Oregon over these same issues for a period of about 10 years. Then there was a curbs case that Mr. Breskin certified that has the same terms in it, by the way, where there's a payment in the past for eugenics UCR reductions and no payment for fair health reductions, which is what he's complaining about here. So there is a complex record. So it's very easy to come into this court and say I came down here from Washington because I care and my client cares. But look at the actual argument that was made in the trial court in light of the standard of review that applies here, which is abuse of discretion. Mr. Shmita mentioned there are some 2,000 pages of policy forms that are in the record for the trial court. Mr. Breskin said there are no policy forms in the record.  He said there's $75 million that were protected here. It's false, Your Honor, and more importantly, it's not in the record. Now, let me say one more thing and then I'll sit down because I'm sure I'm getting over my time. There is a prior case that is exactly like this case. It is Frober against Liberty Mutual Insurance Company. It is cited at pages 17 and 18 of our brief. Okay? The citation is 193 Pacific 3rd 999. In that case, which was from this Oregon proceeding that I mentioned, Liberty Mutual settled these exact claims, claims that UCR reductions were improperly taken with respect to PIP and MedPay bills submitted by doctors in 33 states. One of those 33 states was Delaware. There was an objector from Delaware, and that Delaware objector said, filed an objection to the trial court, lost it, took it up to the Oregon Court of Appeals, and this decision in the Frober case that I just cited comes out of that appeal. In that case, the Oregon, it was literally exactly like this. The Delaware plaintiff's lawyer, who was a class action plaintiff's lawyer, just like Mr. Breskin, who had a filed class action in Delaware that he was trying to protect, okay? He came in and he said, this Oregon court cannot release these Delaware claims because Delaware law is different from Oregon law. In Delaware, we have this late payment statute. So not only do I get to sue for the reduction, okay, whatever the UCR reduction was, but I also get to sue for late payment of the full amount. So I have a better claim in Delaware than I have here in Oregon. So the Oregon court cannot release that better claim because it's a conflict, it's not an accurate representation of all those kinds of things. The Oregon Court of Appeals, just like Your Honors, is faced with this issue, and what the court said is exactly what Mr. Schmider said a minute ago. What matters is, is it the same factual credit? The test, even in Mr. Breskin's brief, the test is you can release a claim provided that it has the same factual credit, not the same legal credit. It doesn't have to arise under the same law. It doesn't have to arise under Oregon law or Delaware law or Illinois law or Washington law. It has to arise from the same factual credit. And this broker case directly addresses this point, and it says the core factual credit, the facts under, the underlying facts remain identical for the, for these classes. Because they involve payment of a bill, fairly paid full amount, and a claim for that fairly paid full amount. I recommend this further decision to you in the strongest terms possible. I thank you for your attention, and I respectfully request that you affirm the judgment. Thank you very much. Mr. Breskin, may I rebuttal? Sure. Thank you. Let me, let me try and separate out two very distinct things because they've been modeled here by the presentation. One is a due process question. Can the release be applied to the claims of Washington providers or providers in other states? That issue's been resolved against them. Okay. That issue was resolved against Safeco. It will be resolved against the remitters of that debt. On these issues, the last of which was just discussed by counsel, the identical factual credit is an issue that relates to due process, federal due process. It's controlled by federal law. The Ninth Circuit has made it clear in a case called Hesse v. Olson, Hesse v. Sprint Corporation, which is cited in our agreement, that you have to have the identical factual credit. That means the claim has to arise under the same facts that would make it legally cognizable under that state's law. That's the problem they have. Illinois and Washington have different laws. As Judge Schaefer ruled, she ruled against them on that point. She rejected both of them. So that issue has already been taken off the table. She's already ruled that the identical factual credit contest was not met. And she's already ruled that due process prohibits under federal law, the Ninth Circuit law, application of the Lebanon settlement to claims of Washington providers. She's already ruled that Lebanon did not possess any Washington claims. So contrary to counsel's argument, I don't know what cases he's referring to. I only know about this case and federal law that's already been ruled on, which is Lebanon doesn't possess Washington claims. It can only possess claims in Illinois. And that makes perfect sense. It's a practice in Illinois. It couldn't possibly bill for medical expenses in any other state. So, here we have the decision already that's been made against Safeco. And I believe it's collateral that it stops. Liberty argued differently on the issues relating to the application of the relief. Let me address. So that means what's left for you to decide is whether the agreement itself is consistent with Illinois law and precedent. And it is not for the reasons that I've given you earlier. First, it's a nationwide settlement that under Avery cannot be presented. Counsel says, well, the circuit board had in front of it all these different policies. Look at the record. The record is very clear. We have a transcript of the proceeding of the circuit court where it made its decision. There is absolutely no reference made whatsoever to these policies. There is no analysis under Avery whatsoever. With regard to counsel's statement about Fulber, this is a case that goes back to 2005. He didn't present, and there's nothing in the record that I've seen, any expert reports, any compositions, nothing, before the circuit court. Nothing. He does reference Fulber at page 60 of the transcript, saying that it was an Oregon case from 2005. He also mentioned to the circuit court that he thought there was $3.6 million at stake. That's impossible. In the Kurtz case versus Safeco, Safeco told the court there was $1.3 to $1.5 million at stake in Washington for Safeco, not Liberty Mutual. We're just talking about Safeco, for a period of three years. This is nationwide. They operate, and this agreement covers over 38 states. The math alone dictates that it's close to $75 million or more. So when you throw in Liberty and Safeco together. So that's where we get the numbers from that he wanted to know. The Lebanon case was filed June of 2014 and settled in October of 2014. Those are the facts. If there was discovery or something related to the reasonableness of this settlement, it's not in the record. You won't find any expert reports in the record except on notice. They did present an expert on notice, but that's not an issue here. The notice would go to the constitutionality of the agreement. I don't know if you have any questions. I don't believe so, counsel. Thank you for your time. Thank you. We will take this case under advisement, and we're going to take a short recess before we proceed with the 11 o'clock case.